# 16-2465-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————————

GEORGE ELIAS, IV, STEPHEN HADFORD, ROSS FOWLER,

*Plaintiffs-Appellants,*

— v. —

ROLLING STONE LLC, SABRINA RUBIN ERDELY,
WENNER MEDIA LLC,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

ALAN L. FRANK
ALAN L. FRANK LAW ASSOCIATES, P.C.
*Attorneys for Plaintiffs-Appellants*
135 Old York Road
Jenkintown, Pennsylvania 19046
(215) 935-1000

## CORPORATE DISCLOSURE STATEMENT

None of the Appellants is a corporate entity, and accordingly there are no

corporate parents to disclose under Federal Rule of Appellate Procedure 26.1.


Respectfully submitted,

/s/ Alan L. Frank, Esq.

_____

Alan L. Frank, Esq.
Counsel for Appellants

# TABLE OF CONTENTS

                                                                 **Page**

TABLE OF AUTHORITIES ............................................................ ii

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF ISSUES PRESENTED...........................................2

CONCISE STATEMENT OF THE CASE ..........................................3

    I.      Procedural History................................................................3

    II.     Statement of Facts ...............................................................4

SUMMARY OF ARGUMENT .........................................................8

ARGUMENT ..............................................................................11

    A.    Standard of Review ...........................................................11

    B.    The Defamatory Statements Meet the "Of and Concerning"
          Requirement Because They Are Sufficiently Applicable To a
          Group of Which the Plaintiffs Were Members ...................13

    C.    The Statements in Count III – That The Rape Seemed Like
          An Initiation Ritual and That the Other Fraternity Brothers
          Likely Knew About the Rape – Are Not Protected as Opinion .........17

    D.    The Defamatory Statements and Extrinsic Facts Meet the "Of
          and Concerning" Requirement for Each Individual Plaintiff .............20

        1.     The defamatory statements and extrinsic facts meet the
              "of and concerning" requirement for George Elias, IV ............21

        2.     The defamatory statements and extrinsic facts meet the
              "of and concerning" requirement for Stephen Hadford............22

        3.     The defamatory statements and extrinsic facts meet the
              "of and concerning" requirement for Ross Fowler...................22

    E.    The Correct Standard On A Motion to Dismiss Defamation
          Claims Based On the "Of and Concerning" Requirement Is
          Determining the Various Possible Interpretations of the
          Statements and Then Deciding Whether At Lease One of the
          Possible Interpretations Was Defamatory ..........................23

CONCLUSION ...........................................................................26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anyanwu v. Columbia Broad. Sys.*,
  887 F. Supp. 690 (S.D.N.Y. 1995) ....................................................11, 23, 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (U.S. 2009) ............................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (U.S. 2007) ............................................................................11

*Brady v. Ottaway Newspapers, Inc.*,
  84 A.D.2d 226, 445 N.Y.S.2d 786 (2d Dep't 1981) ............................*passim*

*Carlucci v. Poughkeepsie Newspapers, Inc.*,
  57 N.Y.2d 883 (1981)..................................................................................20

*Celle v. Filipino Reporters Enters.*,
  209 F.3d 163 (2d Cir. 2000) ........................................................................13

*Church of Scientology Int'l v. Time Warner*,
  806 F. Supp. 1157 (S.D.N.Y. 1992) ......................................................11, 24

*aff'd*,
  238 F.3d 168 (2d Cir. N.Y. 2001) .........................................................12, 24

*Flagler v. Trainor*,
  663 F.3d 543 (2d Cir. 2011) ........................................................................11

*Geisler v. Petrocelli*,
  616 F.2d 636 (2d Cir. 1980) .............................................................8, 12, 20

*Gross v. Cantor*,
  270 N.Y. 93 (1936)......................................................................................24

*Handelman v. Hustler Magazine, Inc.*,
  469 F. Supp. 1048 (S.D.N.Y. 1978) ................................................ 20, 24-25

*Karedes v. The Ackerley Group, Inc.*,
  423 F.3d 107 (2d Cir. 2005) ........................................................................13

*Lasky v. American Broadcasting Cos.*,
  631 F. Supp. 962 (S.D.N.Y. 1986) ..............................................................24

*Levin v. McPhee*,
    119 F.3d 189 (2d Cir. 1997) ...........................................................17

*Phi Kappa Psi v. Rolling Stone*,
    CL 15 – 479 (16th Jud. Ct. Va., Aug. 31, 2016) ...........................16

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986)...............................................................17, 18

*Three Amigos v. CBS News Inc.*,
    132 A.D.3d 82 (1st Dep't 2015) ..................................................20


**Statutes & Other Authorities:**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1294(1) ..........................................................................1

28 U.S.C. § 1391 ...............................................................................1

Rule 12(b)(6)...............................................................................11, 12

Restatement (Second) of Torts, § 614 ......................................10, 12, 24

**JURISDICTIONAL STATEMENT**

The United States District Court for the Southern District of New York had subject matter jurisdiction under 28 U.S.C. § 1391 because there was complete diversity of citizenship and the amount in controversy exceeded $75,000 exclusive of costs and interest.  J.A. at 11-20.

This Court has jurisdiction over this matter under 28 U.S.C. § 1291 and 28 U.S.C. § 1294(1) because this is an appeal from a final decision of the District Court disposing of all claims.  The District Court entered a final order disposing of all claims on June 28, 2016.  J.A. at 147-69.  Plaintiff-Appellants George Elias, IV, Stephen Hadford, and Ross Fowler timely filed a notice of appeal on July 15, 2016.  J.A. at 170.

# STATEMENT OF ISSUES PRESENTED

1.      Whether the District Court erred as a matter of law by holding that the allegedly defamatory statements did not meet the "of and concerning" requirement by making false statements that were sufficiently applicable to a group of which the Plaintiffs were members.

2.      Whether the District Court erred as a matter of law by holding that the statements in Count III – that the rape seemed like an initiation ritual and that the other fraternity brothers likely knew about the rape – were not actionable because they were "couched as speculation or hypothesis."

3.      Whether the District Court erred as a matter of law by holding that the defamatory statements and extrinsic facts did not meet the "of and concerning" requirement for the three Plaintiffs.

4.      Whether on a motion to dismiss defamation claims based on the "of and concerning" requirement, the District Court applied the wrong standard:

      – choosing the proper interpretation of the allegedly defamatory statements and then deciding whether the chosen interpretation was defamatory –
instead of the correct standard:

      – determining the various possible interpretations of the statements and then deciding whether at least one of the possible interpretations was defamatory.

## CONCISE STATEMENT OF THE CASE

**I.      Procedural History.**

This is a defamation case arising out of the retracted Rolling Stone article, "A Rape on Campus:  A Brutal Assault and Struggle for Justice at UVA".  The Plaintiffs-Appellants are George Elias, IV, Stephen Hadford, and Ross Fowler.  J.A. at 11.  The Defendants-Appellees are Rolling Stone LLC and Wenner Media LLC, collectively the publisher of the defamatory article, and Sabrina Rubin Erdely, the journalist who wrote the article.  J.A. at 11-12.

Plaintiffs-Appellants filed this action on July 29, 2015.  J.A. at 2.  On November 25, 2015, the Plaintiffs filed a Second Amended Complaint.  J.A. at 8-53.  On December 23, 2015, Defendants-Appellees filed a Motion to Dismiss.  J.A. at 65-97.  Plaintiffs-Appellants responded to Defendants' Motion to Dismiss on January 27, 2016.  J.A. at 109-133.  On June 28, 2016, the District Court granted Defendants' Motion to Dismiss.  J.A. at 169.  The Memorandum and Order, by United States District Judge P. Kevin Castel, dismissed the defamation claims because the defamatory statements did not meet the "of and concerning" requirement, and because the statements in Count III were opinion and therefore not actionable.  J.A. 147-169.  Plaintiffs-Appellants filed a notice of appeal on July 15, 2016.  J.A. at 170.

## II.    Statement of Facts.

A Rape on Campus describes a gang rape of a University of Virginia freshman, "Jackie" at a Phi Kappa Psi fraternity party by Phi Kappa Psi members and aspiring members.  J.A. at 98-108.  The article alleges that seven men raped Jackie while two other men gave instructions.  J.A. at 101.

During the rape, two of the men say, "Don't you want to be a brother?" and "We all had to do it, so you do, too" to one of the other men.  J.A. at 101.  The article repeatedly describes the experiences of other victims of "Phi Kappa Psi gang rapes."  J.A. at 99-108.  On page 77, Rolling Stone enlarges a quote from the article:  "Jackie came across something disturbing:  Two other young women confided that they, too, had been victims of Phi Kappa Psi gang rapes."  J.A. at 108.  At the front of the article is a full-page illustration of the Phi Kappa Psi fraternity house with the Greek letters "ΦΚΨ".  J.A. at 100.  The article adds that a date-rape drug was found at "Brown University's chapter of Phi Kappa Psi – of all fraternities."  J.A. at 104.

The article discusses other victims of Phi Kappa Psi gang rapes:  "You can trace UVA's cycle of sexual violence and institutional indifference back at least 30 years – and incredibly, the trail leads back to Phi Psi."  J.A. at 106.  Jackie later meets two other "Phi Kappa Psi gang-rape victims."  J.A. at 107.  One was "gang-raped as a freshman at the Phi Psi house", and the other was "assaulted by four

4

men in a Phi Psi bathroom while a fifth watched." J.A. at 107. The article expresses shock and disbelief that UVA did not do anything protect students once UVA learned that members of the same fraternity had raped multiple women: "Given the swirl of gang-rape allegations [Dean] Eramo had now heard against one of UVA's oldest and most powerful fraternities… the school may have wondered about its responsibilities to the rest of the campus." J.A. at 107-108. The article then states that experts consulted by Rolling Stone agreed that UVA was obligated to protect the campus from other gang rapes based on the three reported gang rapes at Phi Kappa Psi. J.A. at 107.

In an interview shortly after the article was published, the journalist stated that the quotes of the two men during the rape, along with other facts in the article, "seems to indicate that this was some kind of initiation ritual." J.A. at 50. During the same interview, the journalist also stated that the other fraternity members likely knew about Jackie's rape. J.A. at 50.

In context, Erdely stated:

I mean I would think that the first thing that they would do is at least tell her, you know, this needs to go to the police, these are dangerous people who are hurting people - who are hurting people - if they hurt you, and you know, and she heard them saying things during the rape like oh, you know, you have to, you know egging - keep egging each other on saying things like "Don't you wanna be a brother" which seems to indicate that this is some kind of initiation ritual.

J.A. at 50 (Slate DoubleX Gabfest (Nov. 27, 2014)).  Erdely also suggested that the other fraternity members likely knew about Jackie's rape:

> I would speculate that life inside of a frat house is a - probably - you know, you have this kind of communal life where everybody's sort of sharing information, it's a very - it's a life where, you know, people are living their lives very closely with one another.  And, um, it seems impossible to imagine that people didn't know about this, that some people didn't know about this, maybe not everybody - it's a fairly large fraternity - there's something like 82 brothers in the fraternity now, currently in there - But it seems impossible to imagine that people did not know about it.

J.A. at 50.

At the time of the alleged rape (fall 2012), there were 53 members of Phi Kappa Psi at UVA.  J.A. at 25.  A total of 31 members were in the classes of 2013 and 2014, the likely graduation years of the rapists based on a quote in the article in the fall of 2014 that all of the perpetrators had graduated.  J.A. at 25; *see also*, J.A. at 108 ("[Dean] Eramo revealed that she learned 'through the grapevine' that 'all the boys involved have graduated.'").

After the publication of the article, Plaintiffs were identified as the subjects of the article.  J.A. at 3-4, 26-27.  The Plaintiffs were listed by name and hometown on publicly available websites in reference to the article.  J.A. at 26. Google searches of their names turned up either the Rolling Stone article itself or news written about the article.  J.A. at 27.  The Plaintiffs were contacted by reporters, peers, and coworkers.  J.A. at 27.

The article claims that Jackie's date "threaded them out of the crowded room and up a staircase." J.A. at 101. "Drew ushered Jackie into a bedroom, shutting the door behind them." J.A. at 101. Elias lived in the only room that was accessible on the second floor of the Phi Kappa Psi house at the time of the alleged events. J.A. at 23-24. His room was the first room at the top of the stairs. J.A. at 23-24. All of the other rooms were blocked off and inaccessible because of a door operated by an electronic keypad lock. J.A. at 23-24.

The article explains that Jackie and Drew "had met while working lifeguard shifts together at the university pool, and Jackie had been floored by Drew's invitation to dinner, followed by a 'date function' at his fraternity, Phi Kappa Psi." J.A. at 101. "Two weeks after Jackie's rape, she ran into Drew during her lifeguard shift at the UVA pool." J.A. at 101. Fowler was the rush chair in 2010-2011 and active in the 2011-2012 recruitment at Phi Kappa Psi-UVA. J.A. at 25. Fowler was also an avid swimmer – he swam at the UVA aquatic center between several times per week and once per two weeks, depending on the semester. J.A. at 25.

At a meeting in the fall of 2014, "According to both women [Jackie and a friend], [Dean] Eramo revealed that she learned 'through the grapevine' that 'all of the boys have graduated.'" J.A. at 108. Jackie was "mystified because she had "just seen one of the boys riding his bike on grounds…" J.A. at 108. Only

Hadford reconciles this apparent contradiction in the article because Hadford lived on campus for 15 months after graduating. J.A. at 24. He frequently rode his bike around campus to work at the UVA emergency department, to his girlfriend's house, to his brother's dormitory, and to his sister's apartment. J.A. at 24.

## SUMMARY OF ARGUMENT

A defamatory allegation against all members of a group is defamatory as to each member of the group. *See generally*, *Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226 (2d Dep't 1981). Alternatively, a plaintiff may establish that he is defamed as a member of a group by pointing to extrinsic facts that would link him to the allegation. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). A plaintiff does not need to show that all readers would understand – it is sufficient if readers who know the plaintiff and the extrinsic facts could make the connection. *Id.*

Two of the rapists say "Don't you want to be a brother?" and "We all had to do it, so you do, too", and the article repeatedly discusses other "Phi Kappa Psi gang-rape victims." J.A. at 101. These facts seem to indicate gang rape was an initiation ritual, or a condition of membership in Phi Kappa Psi at UVA. This must be at least a reasonable interpretation because it is literally the journalist's interpretation of her own article: "… seems to indicate that this was some kind of initiation ritual." J.A. at 50 (quoting an interview shortly after the article was

published).   An initiation ritual suggests that other members had to do something similar.  A Virginia state court's interpretation of the same article in the fraternity's case against Rolling Stone (opinion issued while this appeal was pending) is instructive.  That court reasoned that repeated references to other Phi Kappa Psi gang rapes made it reasonable to conclude that "it was not just one or a few individuals viewed as 'the problem', but rather the UVA fraternity as a whole was painted in a bad light."

Alternatively, extrinsic facts about each Plaintiff are sufficient to connect the Plaintiffs to the allegations in the article.  This theory is supported by the fact that people actually used extrinsic facts to link the Plaintiffs to the allegations in the article.  *E.g.*, J.A. at 26 (websites listed the Plaintiffs by name and home address in reference to the article).

The statements in Count III – that statements during the rape in view of other facts seemed to indicate it was an initiation ritual, and that other fraternity members probably knew about the rape – are not protected as opinion.  The statements have a specific meaning, they can be proven true or false, they are spoken by the journalist as an authority on the subject, and they are spoken by the journalist about the meaning of her own article.

In order to hold that the article was not "of and concerning" the Plaintiffs, this Court would logically have to accept the following:

9

A.    It was not reasonable to conclude that Jackie was raped during a fraternity initiation ritual, even though the journalist's interpretation of her own article is that it "seems to indicate that this was some kind of initiation ritual." J.A. at 50.

B.    It was not reasonable to conclude that Jackie was raped during an initiation ritual, even though two of the rapists say "Don't you want to be a brother?" and "We all had to do it, so you do, too", and the article repeatedly discusses other "Phi Kappa Psi gang-rape victims." J.A. at 101.

C.    One could not use extrinsic facts to identify the Plaintiffs as the subjects of the article, even though people actually used extrinsic facts to identify the Plaintiffs as the subjects of the article. J.A. at 34-39.

D.    It was not reasonable to conclude that other fraternity members knew about Jackie's rape, even though the journalist said in an interview that other fraternity members probably knew about Jackie's rape. J.A. at 50.

If there is a reasonable interpretation of the defamatory statements that is "of and concerning" the Plaintiffs, then the claims survive a motion to dismiss. The Court's role is to determine whether at least one of the reasonable interpretations of the statements is defamatory. If there is a reasonable defamatory interpretation, the jury then decides which interpretation controls. Rest. (Second) of Torts, § 614 ("The court determines... whether a communication is capable of bearing a

10

particular meaning...  The jury determines whether a communication... was so understood...").  The District Court erred by instead determining the proper interpretation of the article and then determining that it was not defamatory.  For the reasons below, there is a reasonable interpretation that is of and concerning the Plaintiffs.  The District Court's order dismissing the claims should be reversed.

## ARGUMENT

### A.   Standard of Review.

A Rule 12(b)(6) dismissal of a complaint is reviewed *de novo*.  *Flagler v. Trainor*, 663 F.3d 543, 545 (2d Cir. 2011).  The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted).  A complaint "does not need detailed factual allegations," but "requires more than labels and conclusions, and a formulaic recitation of the elements..."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (U.S. 2007).

When a 12(b) motion challenges a defamation claim based on the "of and concerning" requirement, the question for the Court is whether at least one reasonable interpretation is "of and concerning" the plaintiff.  *Anyanwu v. Columbia Broad. Sys.*, 887 F. Supp. 690, 692 (S.D.N.Y. 1995); *Brady*, 84 A.D.2d 226, 232, 445 N.Y.S.2d 786, 790 (2d Dep't 1981); *Church of Scientology Int'l v. Time Warner*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992) ("Although the of and

11

concerning requirement is generally an issue of fact, which the jury alone may decide, the Court properly may dismiss an action pursuant to Rule 12(b)(6) where the statements are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff."), *aff'd*, 238 F.3d 168, 172 (2d Cir. N.Y. 2001). If the Court determines that the statement is capable of a defamatory meaning, then the jury determines whether the statement was so understood. Rest. (Second) of Torts, § 614. A plaintiff may satisfy this requirement where the article defames all members of a group. *See generally*, *Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226 (2d Dep't 1981). Alternatively, the plaintiff may meet the of and concerning requirement with extrinsic facts that tend to cast suspicion on him as the subject of the article – "[i]t is not necessary that all the world should understand the libel; it is sufficient if those who know the plaintiff can make out that [he] is the person meant." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).

Several principles guide the Court's interpretation of the allegedly defamatory statements:

> First the Court of Appeals has repeatedly instructed that courts must give the disputed language a fair reading in the context of the *publication as a whole*. Challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing.

Second, courts are not to strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous. A fair reading controls.

Finally, the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood *by the public to which they are addressed*. It is the meaning reasonably attributable to the intended reader that controls.

*Karedes v. The Ackerley Group, Inc.*, 423 F.3d 107, 113-14 (2d Cir. 2005) (quoting

*Celle v. Filipino Reporters Enters.*, 209 F.3d 163, 177-78 (2d Cir. 2000))

(emphasis in original).

**B.      The Defamatory Statements Meet the "Of and Concerning" Requirement Because They Are Sufficiently Applicable To a Group of Which the Plaintiffs Were Members.**

An allegation against all members of a group is "of and concerning" every member of the group. *See generally*, *Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226 (2d Dep't 1981). Here, the article alleges that two of the rapists say "Don't you want to be a brother?" and "We all had to do it, so you do, too." Erdely clarified in an interview shortly after the article was published, "… 'Don't you want to be a brother' which seems to indicate that this is some kind of initiation ritual." J.A. at 50 (Slate DoubleX Gabfest (Nov. 27, 2014)). The context, and Erdely's comment, make clear that the article alleges that gang-rape was an initiation ritual or a condition of membership. The article emphasizes again and again that it was a Phi Kappa Psi gang-rape and that Phi Kappa Psi gang-rapes were a recurring danger to the campus community:

13

- "…although they were appalled by Jackie's story, no one voiced questions about UVA's strategy of doing nothing to warn the campus of gang-rape allegations against a fraternity that still held parties and was rushing a new pledge class." J.A. at 107.

- "Jackie had come across something deeply disturbing: two other young women who, she says, confided that they, too, had recently been Phi Kappa Psi gang-rape victims." Id. "One, she says, is a 2013 graduate, who'd told Jackie that she'd been gang-raped as a freshman at the Phi Psi house." Id. "The other was a first-year whose worried friends had called Jackie after the girl had come home wearing no pants. Jackie said the girl told her she'd been assaulted by four men in a Phi Psi bathroom while a fifth watched." J.A. at 107.

- "Given a swirl of gang-rape allegations Eramo had now heard against one of UVA's oldest and most powerful fraternities… the school may have wondered about its responsibilities to the rest of the campus." J.A. at 107-108.

- "…having learned of Rolling Stone's prove into Jackie's story, UVA at last placed Phi Kappa Psi under investigation." J.A. at 108.

- Two of the rapists say "Don't you want to be a brother?" and "We all had to do it, so you do, too." J.A. at 101.

- "They [Jackie's friends] all knew about Jackie's date; the Phi Kappa Psi house loomed behind them." J.A. at 101.

- Weeks later, a friend asks, "Why didn't you have fun with it? … A bunch of hot Phi Psi guys?" J.A. at 108.

- The article mentions the "suspension of Brown University's chapter of Phi Kappa Psi – of all fraternities – after a partygoer tested positive for the date-rape drug GHB." J.A. at 104 (emphasis added).

- "In the meantime, having presumably judged there to be no threat to public safety, the UVA administration took no action to warn the campus that an allegation of gang rape had been made against an active fraternity." J.A. at 106 (emphasis added).

14

- "You can trace UVA's cycle of sexual violence…back at least 30 years – and incredibly, the trail leads back to Phi Psi." J.A. at 106.

Erdely confirmed in an interview shortly after the article was published that the statements made during the rape in light of the other allegations in the article indicate that it was part of an initiation ritual: "… saying things like 'Don't you wanna be a brother?' which seems to indicate that this is some kind of initiation ritual." J.A. at 50. The article defames all then-members of Phi Kappa Psi at UVA for another reason: the article implies, and Erdely later confirmed, that all of the members knew about Jackie's rape:

> I would speculate that life inside of a frat house is a – probably – you know, you have this kind of communal life where everybody's sort of sharing information, it's a very – it's a life where, you know, people are living their lives very closely with one another. And, um, it seems impossible to imagine that people didn't know about this, that some people didn't know about this, maybe not everybody – it's a fairly large fraternity – there's something like 82 brothers in the fraternity now, currently in there – But it seems impossible to imagine that people did not know about it.

Slate DoubleX Gabfest (Nov. 27, 2014); see *Brady*, 84 A.D.2d at 227 (allegation of "guilty knowledge" defamatory).

This interpretation finds support from a Virginia Circuit Court's decision denying Rolling Stone's request to dismiss the fraternity's defamation claims. The court reasoned that it was reasonable to conclude that "it was not just one or a few individuals viewed as 'the problem', but rather the UVA fraternity as a whole was painted in a bad light."

15

As pleaded, taken as a whole, the article is primarily and significantly about this particular fraternity, and was certainly 'of and concerning' the Plaintiff, and the article's intent and focus was not just the individual assailants, or fraternities in general, or all fraternities at UVA, or the University itself, but rather this fraternity in particular. The combination of the numerous repeated, direct, explicit references to Phi Kappa Psi, combined with several implied references to 'a major frat', 'a top tier frat', the 'frat that was suspended', in conjunction with the various individuals referenced as affiliated with the fraternity, if borne out by the evidence, clearly establishes that it is the fraternity itself that is the main target of the article.

It is not, in the Court's view, just as likely that the article, as pleaded, raises the likelihood or even possibility that rogue members or aspiring members were responsible for the described rape, or were the main actors, as suggested by Defendants. The article taken as a whole, again as pleaded, clearly paints the rape as a fraternity event and happening. That is a clear possible interpretation, in the Court's view, of the references to previous PKP events and accusations, and the discussion about UVA's responsibility to confront or sanction this particular fraternity for the risk it presented to the rest of the University and it [sic] students.

*Phi Kappa Psi v. Rolling Stone*, CL 15 – 479, page 8 (16th Jud. Ct. Va., Aug. 31, 2016).

Based on the numerous allegations in the article about Phi Kappa Psi gang rapes, and the journalist's interpretation of her own article, it is reasonable to interpret the article as describing an initiation ritual or condition of membership that implicates all-then members of Phi Kappa Psi at UVA. The District Court's order should be reversed.

**C.**     **The Statements in Count III – That The Rape Seemed Like An Initiation Ritual and That the Other Fraternity Brothers Likely Knew About the Rape – Are Not Protected as Opinion.**

Where the allegedly defamatory statements "are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact", and the statements are therefore not actionable. *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997). New York courts consider a non-exclusive list of factors to determine whether a statement is fact or opinion: 1) whether the specific language has a precise meaning or whether it is indefinite and ambiguous; 2) whether the statement can be true or false; 3) the full context in which the statement appears; and 4) the broader social context or setting surrounding the statement. *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 292 (1986).

Erdely stated in an interview shortly after the article was published:

I mean I would think that the first thing that they would do is at least tell her, you know, this needs to go to the police, these are dangerous people who are hurting people – who are hurting people – if they hurt you, and you know, and she head them saying things during the rape like oh, you know, you have to, you know egging – keep egging each other on saying things like "Don't you wanna be a brother?" which seems to indicate that this is some kind of initiation ritual.

…

I would speculate that life inside of a frat house is a -- probably – you know, you have this kind of communal life where everybody's sort of sharing information, it's a very – it's a life where, you know, people are living their lives very closely with one another. And, um, it seems impossible to imagine that people didn't know about this, that some people didn't know about this, maybe not everybody – it's a fairly large fraternity – there's something like

17

> 82 brothers in the fraternity now, currently in there – But it seems impossible to imagine that people did not know about it.

J.A. at 50.

In context, Erdely's statement that the rapists' statements and other facts "seems to indicate that this is an initiation ritual" is a statement of fact under the factors in *Steinhilber*. The statement has a specific meaning – Erdely literally said that Jackie's rape seemed like an initiation ritual. The statement can be proven true or false – Phi Kappa Psi has such an initiation ritual, or it does not. In context, the statement follows up and supports Erdely's earlier statement that UVA should have called the police because "these are dangerous people who are hurting people." Erdely's statement also carries more weight because Erdely is speaking to the meaning of her own publication. Finally, Erdely is speaking from a position of expertise because she had extensively researched Jackie's case, interviewed witnesses, and researched other sexual assaults.

Erdely's statement that "it seems impossible to imagine that people did not know about it" also is a statement of fact. This statement has a specific meaning – that other members knew about what happened to Jackie. The statement can be proven true or false - other Phi Kappa Psi members knew about Jackie's rape or they did not. The context adds weight to the statement because Erdely had spent considerable time investing Jackie's experience, contacting other victims, and

interviewing witnesses.  Erdely's statement also carries additional weight because she is speaking to the meaning of her own article.

The District Court's holding depended almost exclusively on the words "seems", "I would speculate that", and "maybe not everybody" (in reference to whether other members knew about Jackie).  But qualifiers alone do not define the character of the statements.  The journalist is speaking as an authority on campus rapes who has just spent months researching Jackie's case and other related cases, explaining the meaning of her own article, and making statements that can be objectively proven true or false.

Even if the Court holds that the podcast statements were opinion, they must still at least be a reasonable interpretation because they are the journalist's own interpretation.  The Court must also interpret the article in view of the interview because some readers also listened to the interview.  Readers who were unsure of the meaning of the article, who then listened to the interview, would have heard the journalist's explanation and concluded that the rape was an initiation ritual. Readers who understood that the rape was an initiation ritual would have their opinions reinforced by the interview.  And readers who did not interpret the rape to be an initiation ritual may have been persuaded by the journalist's own interpretation of the article.  The Court must take into consideration that given the gravity of the allegations, the journalist's statements carried enormous weight.  For

these reasons, the Court should reverse the District Court and hold that Erdely's statements are actionable.

## D. The Defamatory Statements and Extrinsic Facts Meet the "Of and Concerning" Requirement for Each Individual Plaintiff.

A plaintiff may also meet the of and concerning requirement by showing that specific facts cast suspicion on him as the subject of the defamatory allegations. A plaintiff must plausibly allege that "[t]he reading public acquainted with the parties and the subject" would have understood the allegedly defamatory statement to be "of and concerning" the plaintiff. *Carlucci v. Poughkeepsie Newspapers, Inc.*, 57 N.Y.2d 883, 885 (1981). The Plaintiffs are not limited to the facts in the article – the Plaintiffs may satisfy the of and concerning requirement "by the use of extrinsic evidence." *Handelman*, 469 F. Supp. at 1050. "It is not necessary that all the world should understand the libel; it is sufficient if those who know the plaintiff can make out that [he] is the person meant." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "A plaintiff bears the burden of pleading and proving that the asserted defamatory statement designates the plaintiff in such a way as to let those who knew him understand that he was the person meant." *Three Amigos v. CBS News Inc.*, 132 A.D.3d 82, 89 (1st Dep't 2015).

1.    **The defamatory statements and extrinsic facts meet the "of and concerning" requirement for George Elias, IV.**

Elias resided in the only bedroom where the purported rape could have occurred because every other room on the second floor was blocked off from the staircase.  The article described the location of Jackie's rape:

> "Want to go upstairs, where it's quieter?" Drew shouted into her ear, and Jackie's heart quickened. She took his hand as he threaded them out of the crowded room and up a staircase.
> …
> Now, climbing the frathouse stairs with Drew, Jackie felt excited. Drew ushered Jackie into a bedroom, shutting the door behind them.

Based on the layout of the fraternity house, Elias lived in the only room in which Jackie could have been raped.  J.A. at 23-24.  Every other second-floor room was blocked off.  J.A. at 23-24.  Only Elias's room is consistent with the article's statement that "…he threaded them out of the crowded room and up a staircase. … Drew ushered Jackie into a bedroom, shutting the door behind them."  No locked door blocks Jackie on her way out. Jackie does not have trouble finding the exit. Rather, she runs barefoot down a side staircase, through the fraternity party, and leaves the fraternity house.  J.A. at 101.

Elias meets the of and concerning requirements because, based on the layout of the fraternity house, he lived in the only room in which Jackie could have been raped.  For these reasons, the Court should reverse the dismissal as to Elias.

21

### 2. The defamatory statements and extrinsic facts meet the "of and concerning" requirement for Stephen Hadford.

Hadford is the only person who can reconcile the apparent contradiction in the article: "[Dean] Eramo revealed that… 'all the boys involved have graduated" – Jackie is "mystified" because "Jackie [had] just seen one of the boys riding his bike on grounds …" J.A. at 108. Hadford lived on campus for 15 months after graduating. J.A. at 24. He frequently rode his bike around campus to work at the UVA emergency department, to his girlfriend's house, to his brother's dormitory, and to his sister's apartment. J.A. at 24-25.

Readers aware of those facts would reasonably conclude that Hadford must have been the person who Jackie saw riding his bike on campus after all of the rapists had graduated. The fact that Hadford lived on campus after graduating and rode his bike around campus explained why Dean Eramo believed the rapists already graduated but Jackie nevertheless saw one of them riding his bike on campus. Hadford is the only person who can make both statements true. For these reasons, the Court should reverse the dismissal as to Hadford.

### 3. The defamatory statements and extrinsic facts meet the "of and concerning" requirement for Ross Fowler.

Fowler was the rush chair in 2010-2011 and active in the 2011-2012 recruitment. J.A. at 25. The article made rape seem like an initiation ritual, which implicated Fowler because of his public role in recruiting. J.A. at 25; see *Brady*,

22

84 A.D.2d at 235 ("prominent position" in a group increases the likelihood of being identified as the subject of the defamatory statement). As a result, reasonable readers could conclude that Fowler was involved in Jackie's rape and other rapes by virtue of his prominent role in initiating new members. Moreover, Fowler was also an avid swimmer – he swam at the UVA aquatic center between several times per week and once per two weeks, depending on the semester. J.A. at 25. The article implicated Fowler by emphasizing Jackie's meetings with one of the rapists at the aquatic center. Acquaintances of Fowler aware of these extrinsic facts would reasonably conclude that he was one of the perpetrators described in the article. For these reasons, the Court should reverse the dismissal as to Fowler.

**E.      The Correct Standard On A Motion to Dismiss Defamation Claims Based On the "Of and Concerning" Requirement Is Determining the Various Possible Interpretations of the Statements and Then Deciding Whether At Lease One of the Possible Interpretations Was Defamatory.**

Whether a statement <u>can</u> be understood as defamatory is a question of law for the Court, but which of several possible interpretations controls is a question of fact for the jury. Case law is clear that the "of and concerning" is a jury question. *Anyanwu v. Columbia Broad. Sys.*, 887 F. Supp. 690, 692 (S.D.N.Y. 1995) ("The of and concerning requirement is generally a question of fact for the jury…"); *Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226, 232, 445 N.Y.S.2d 786, 790 (2d Dep't 1981) ("But if the words may by any reasonable application, import a charge against several individuals, under some general description or general

23

name, the plaintiff has the right to go on to trial, and it is for the jury to decide, whether the charge has the personal application averred by the plaintiff.") (quoting *Gross v. Cantor*, 270 N.Y. 93 (1936)); *Lasky v. American Broadcasting Cos.*, 631 F. Supp. 962, 968 (S.D.N.Y. 1986) ("If the program is ambiguous and capable of supporting several meanings, one of which is defamatory, it is for the jury to decide…").  The Restatement explains:  "The court determines... whether a communication is capable of bearing a particular meaning...  The jury determines whether a communication... was so understood..."  Rest. (Second) of Torts, § 614.

At the Motion to Dismiss stage, the only question for the Court to decide is whether the article and extrinsic facts are sufficient for a jury to find for the Plaintiffs.  *Id.*  Once the Court finds that at least one reasonable interpretation is "of and concerning" the Plaintiffs, the analysis ends and the jury decides whether the defamatory interpretation is better than a non-defamatory interpretation. *Anyanwu* at 692; *Brady*, 84 A.D.2d 226, 232, 445 N.Y.S.2d 786, 790 (2d Dep't 1981); *Church of Scientology Int'l v. Time Warner*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992) ("Although the of and concerning requirement is generally an issue of fact, which the jury alone may decide, the Court properly may dismiss an action pursuant to Rule 12(b)(6) where the statements are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff."), *aff'd*, 238 F.3d 168, 172 (2d Cir. N.Y. 2001); *Handelman v. Hustler Magazine, Inc.*, 469 F.

Supp. 1048, 1049-50 (S.D.N.Y. 1978) ("Moreover, it is for the jury to decide whether a written defamatory statement applies to plaintiff. … At trial, a plaintiff is entitled to prove this fact by the use of extrinsic evidence.")

The District Court erred as a matter of law in choosing which interpretation of the allegedly defamatory statements controls with regards to the "of and concerning" requirement, then deciding whether the chosen interpretation is defamatory. Instead, the District Court adopted the Defendants' more mild interpretation of the article and then held that the interpretation was not defamatory. For example, in rejecting the interpretation that rape was a condition of membership, the court emphasized that the focus of the article is on "Jackie"; "the title, 'A Rape on Campus', places its focus on the experience of 'Jackie'"; and that "one would expect that a report that more than eighty men were members of an organization requiring rape as a pre-condition of membership would bear a different title." J.A. at 159. The District Court did not consider whether other defamatory interpretations were also reasonable. Rather, the District Court reasoned that because the article focuses on Jackie and because the title suggests the story is about a single rape, the better interpretation was that the intention of the article was only to highlight Jackie's rape and her experience with her peers and the university administrators. The Court should instead consider whether the defamatory interpretation is itself reasonable. Here, that interpretation is supported

by the repeated references to other gang rapes at Phi Kappa Psi, the statements of two of the rapists during the rape, and the journalist's statements about the meaning of her own article.

For these reasons, the Court should reverse the order of the District Court dismissing the Plaintiffs' claims.

## CONCLUSION

The District Court erred as a matter of law in granting the Defendants' Motion to Dismiss and dismissing the Plaintiffs' claims for failure to state a claim. This Court should reverse the decision of the District Court, the case should be remanded, and the parties should commence discovery before the District Court.

Respectfully submitted,

/s/ Alan L. Frank
Alan L. Frank
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046
215-935-1000
215-935-1110 (fax)
afrank@alflaw.net

Attorneys for Plaintiffs-Appellants
George Elias, IV
Stephen Hadford
Ross Fowler

October 14, 2016

ADDENDUM

# COMMONWEALTH OF VIRGINIA



Daniel R. Bouton
P.O. Box 230
Orange, Virginia 22960
(540) 672-2433
(540) 672-2189 (fax)

Timothy K. Sanner
P.O. Box 799
Louisa, Virginia 23093
(540) 967-5300
(540) 967-5681 (fax)

### Sixteenth Judicial Court

| Albemarle | Culpeper | Fluvanna | Goochland |
|---|---|---|---|
| Greene | Louisa | Madison | Orange | Charlottesville |

Cheryl V. Higgins
501 E. Jefferson St., 3rd Floor
Charlottesville, Virginia 22902
(434) 972-4015
(434) 972-4071 (fax)

Susan L. Whitlock
135 West Cameron Street
Culpeper, Virginia 22701
(540) 727-3440
(540) 727-7535 (fax)

Richard E. Moore
315 East High Street
Charlottesville, Virginia 22902
(434) 970-3760
(434) 970-3038 (fax)

August 31, 2016

Thomas E. Albro, Esq.
TREMBLAY & SMITH, PLLC
105-109 East High Street
Charlottesville, Virginia 22902

Rodney A. Smolla, Esq.
4601 Concord Pike
Wilmington, Delaware 19803

W. David Paxton, Esq.
GENTRY LOCKE
10 Franklin Road, S.E., Suite 900
Roanoke, Va. 24022-0013

Elizabeth McNamara, Esq.
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

Alison Schary, Esq.
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20006-3401

Re: Phi Kappa Psi v. Rolling Stone, et al.— Demurrer
Circuit Court file no. CL 15 – 479; hearing May 17, 2016

Dear Counsel:

I have now had a chance, since August 1, to fully review this matter, including re-reading all of the pleadings as well as many of the cases cited, and reviewing my notes from the May 17 hearing. The issue before the Court is whether Defendant's Demurrer should be sustained or overruled.

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary, Esqs.
August 31, 2016
Page Two (of 12)

## Procedural Posture

Plaintiff The Virginia Chapter of Phi Kappa Psi Fraternity ("PKP") filed a complaint November 9, 2015, against Defendants Rolling Stone LLC, Wenner Media LLC, Straight Arrow Publishers LLC, and Sabrina Rubin Erdely.

The Defendants then filed their Demurrers to the Complaint March 3, 2016.[1]

Plaintiff then filed a Response to the Demurrer March 25, 2016, and Defendants on April 11 filed a Reply to the Response in Further Support of the Demurrers to the Complaint.

The Parties appeared May 17, 2016, to argue the Demurrer.

Defendants submitted a letter with authority and further argument dated June 29, 2016, and Plaintiff submitted a similar letter on June 30. I have read these letters in addition to the pleadings and the cases.

## Legal Authority and Standard for Considering Demurrer

A demurrer tests the legal sufficiency of a pleading. The issue is whether the Complaint states a cause of action for which relief may be granted. Pendleton v. Newsome, 290 Va. 162, 171, 772 S.E. 2d 759 (2015); Welding, Inc. v. Bland County Service Auth., 261 Va. 218, 226, 541 S.E.2d 909, 913 (2001); Grossman v. Saunders, 237 Va. 113, 119, 376 S.E.2d 66, 69 (1989). The question is: does the Complaint contain sufficient factual recitations or allegations to support or sustain the granting of the relief requested?

A demurrer is not interested in or dependent on the evidence—neither its strength nor a determination of whether the Plaintiff can prove its case. In ruling on a demurrer the Court does not consider the anticipated proof but only the legal sufficiency of the pleadings, and it considers the facts and allegations in the light most favorable to the plaintiff. Glazebrook v. Board of Supervisors of Spotsylvania County, 266 Va. 550, 554, 587 S.E.2d 589, 591 (2003); Welding, above, 261 Va. at 226, 541 S.E.2d at 913; Luckett v. Jennings, 246 Va. 303, 307, 435 S.E.2d 400, 402 (1993).

A demurrer accepts all well-pleaded facts or allegations as true, along with all reasonable inferences drawn therefrom. That is, the Court considers as admitted all facts expressly or impliedly alleged or that may fairly and justly be inferred from the facts alleged. Glazebrook, Luckett, Grossman, above; Cox Cable Hampt., Rds. v. City of Norfolk, 242 Va. 394, 397 (1991).

---

[1] Defendants were all served in late January or early February 2016, and the time for Defendants to file a responsive pleading was extended by agreement of the parties to March 3, 2016.

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary, Esqs.
August 31, 2016
Page Three (of 12)

So if I accept all Plaintiff says as true, does Plaintiff then prevail? If so, I should overrule the demurrer. Put another way, given all that is alleged, is this a case where a jury or judge ought to be allowed to decide whether the allegations are true or have been proved?

There is another way of expressing this standard when ruling on a demurrer. In the context of defamation, many of the cases and counsel have restated this standard, particularly with regard to the issue of whether there is defamatory content or meaning, but also with regard to the other two issues, by asserting that the Court has a "gatekeeping function", and must determine whether the article is capable or susceptible of such defamatory meaning, whether it is capable of being reasonably understood to refer to the plaintiff, and whether it is capable of being proved true or false; if not, on any count, the demurrer should be sustained.

Nevertheless, even with this standard, in considering a demurrer the Court should not engage in evaluating evidence outside of the pleadings. So it is the facts as pleaded upon which the court must make its ruling. For anything outside of the pleadings, dependent on the evidence presented at trial, the Court would have to reserve its gatekeeping function for trial, before submission to the jury, perhaps on a motion for summary judgment or motion to dismiss.

However, in this case, the Plaintiff made the entire article--in fact both the print and online versions--an exhibit to the Complaint. Therefore, in my view, the entire article is made a part of the Complaint for purposes of notice, allegations, and consideration of the demurrer.

### Factual Background

Plaintiff's claims are based on the content of an article that appeared in the *Rolling Stone* magazine November 19, 2014.[2] *Rolling Stone* magazine is published by Defendant Rolling Stone LLC, with its member (owning) companies Defendants Wenner Media LLC and Straight Arrow Publishers LLC. The article was written by Defendant Sabrina Rubin Erdely.

In the article a violent rape is recounted by the purported victim, which takes place at the Phi Kappa Psi (also PKP or "Phi Psi") fraternity house on the edge of the University of Virginia grounds, at a PKP-sponsored function, by individuals some or all of which are stated or understood to be associated with the fraternity.

In the article describing the event, Phi Kappa Psi at UVA is mentioned at least 18 times by name (Phi Kappa Psi, PKP, or Phi Psi). There are at least 9 other references to "that

---

[2] The article appeared in the December 4, 2014 print edition of the magazine, but was posted on its online edition on November 19, 2014. They are both incorporated into the Complaint. ¶33 of the Complaint.

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary, Esqs.
August 31, 2016
Page Four (of 12)

fraternity", "a frat", "the fraternity", "his frat", etc., which in context specifically refer to Phi
Kappa Psi at UVA. There are at least 8 times where the term "gang rape" is used, many in the
same phrase or sentence as "Phi Kappa Psi" or its variations.

## The Complaint

Plaintiff's Complaint (Counts 1 and 2) alleges that both the print article and the on-line
version are defamatory of PKP, in that they contain false statements that accuse the fraternity
itself and its members of criminal activity involving moral turpitude, brutish and violent
behavior, and hiding the truth, both directly and indirectly painting the fraternity in a false light,
and holding the fraternity up to public criticism, ridicule, and scorn, resulting in damage to the
fraternity's reputation, and causing anger and distress, and hurting its ability to acquire new
members.[3]

## The Demurrer

Defendants say that Plaintiff cannot prevail, and that it has not stated a cause of action
because:

1) The article complained of is not "of and concerning" Phi Kappa Psi at UVA.
2) The article is not defamatory.
3) The statements complained of are not factual statements but opinions.[4]

## Analysis and Discussion of Authority

Whether the Complaint states a cause of action turns on three points or inquiries

1. Whether the article is of, about, concerning or focused on Plaintiff;

---

[3] The original Complaint also includes a subsequent post-article statement and interview (Counts 3 and 4),
although they are not the basis for a separate count, as they were withdrawn by Plaintiff at the May 17, 2016,
hearing, and the allegations contained there are not an independent basis for recovery, and would be relevant or
pertinent here, if at all, only in so much as they reinforce, support, or corroborate any facts or issues related to the
two articles.

[4] The Demurrer originally also addressed two other matters not at issue here—Counts 3 and 4, which were
withdrawn, and the request for attorney's fees, which also was withdrawn by Plaintiff at the May 17 hearing.
Defendants also point out that the article contains many factually true statements.

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary. Esqs.
August 31, 2016
Page Five (of 12)

      2.  Whether the article--if of, about, concerning or focused on Plaintiff--is defamatory of Plaintiff; and,

      3.  Even if the article is of and concerning PKP, and the content of the article, or at least a good portion of it, holds Plaintiff in a bad light, are such statements factual in nature and susceptible of being proved true or false, or just opinion? (In the context of the demurrer, on this third point, do Defendants' claims turn on their interpretation of the article, as opposed to what it actually says?)

### Of and Concerning

The first issue raised in the Demurrer and to be addressed here, is whether the article and the purportedly false and defamatory statements contained in it have to do with—that is, were "of and concerning"—the plaintiff, the fraternity Phi Kappa Psi at UVA, as opposed to the individuals involved, all fraternities at UVA, fraternities in general, or the University of Virginia itself. So, if the article is false, or contains significant false statements, and if the article is--or such statements in it are--in fact defamatory (both issues discussed below), the question is: "Who is defamed by such?" The defamation, if it exists, must be about or focused on the Plaintiff Phi Kappa Psi in order for it to prevail.

If the article or such false and defamatory statements are just about the alleged individual perpetrators who just happened to be members of PKP, or were simply attending a PKP function, that is not sufficient, nor is that it happened at the frat house (whether an official function or not). Plaintiff must show that the statements in the article, when taken as a whole, were either solely or primarily about the fraternity.

Defendants, in their written responses and in argument at the hearing, assert that the statements, or the bulk of them, and the focus and tenor of the article, are about "Drew", the purported initial offender, or "rogue" members or pledges of the fraternity, or fraternities in general, or the University of Virginia.

Plaintiff, in the Complaint, cites and quotes numerous passages from the article that focus specifically and repeatedly on the Phi Kappa Psi fraternity. Just to mention a few, from the Complaint, there is a reference to a "Phi Kappa Psi brother"[5] (¶35, page 14 of Complaint), "his fraternity Phi Kappa Psi", "The upper tier frat…", and "Phi Psi" (¶35, page 15), a "Phi Kappa Psi

---

[5] One initially wonders what difference does it make, to the writer, that the individual is a member of the fraternity if that is not going to be a major focus of the article?

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary. Esqs.
August 31, 2016
Page Six (of 12)

date function" (¶¶40, pages 17-18), and the victim "taking on" her individual alleged assailants *"and their fraternity"*. (¶42, page 18, *italics* added). Furthermore the Complaint recounts a moment when one individual apparently is reluctant to participate in the severe assault, and another says, "don't you want to be a brother? *We all* had to do it" (page 16, *italics* added). The Complaint also refers to the illustration of the PKP house, and the letters "PKP" displayed on a banner" (¶42, pages 18-19). There is a reference to "tracing this incident back 30 years ago" to PKP (¶47, page 20).[6]  There are other PKP-related allegations in the Complaint.

Also, in considering the "of and concerning" requirement, the question is, is the article, or are sufficient statements in the article, about or focused on the University of Virginia Phi Kappa Psi chapter itself, either instead of or conjointly with the University of Virginia, other fraternities at UVA, or fraternities in general. The short answer, in the Court's view, is "yes".

As stated above, in the Complaint Plaintiff alleges numerous points at which the Phi Kappa Psi fraternity at UVa is mentioned, not just as the location of the alleged offense, but as the actual offender, the "adversary" who must be proceeded against. I do not recall any other fraternity besides Phi Kappa Psi being mentioned by name; it is certainly the only one repeated over and over.

To the extent that Phi Kappa Psi at Brown University is mentioned, it arguably is mentioned to lend credence to the idea that PKP is a "bad egg" wherever found, particularly at UVA, where other mentions of PKP at UVA include Ms. Seccuro's rape at Phi Kappa Psi and two other girls who are described as victims of a PKP rape.

If one considered only the first two pages of the article, one might be persuaded that the article was going to address fraternities in general, or sexual assault on campuses in general. The first two paragraphs (on page 68 of the print article) mention a fraternity house, a fraternity party, and PKP once. But it appears that the writer is simply preparing the reader for what is coming; taking the entire article as a whole does not allow this interpretation or conclusion:

On page 69 is a photograph of the PKP house and the lettering "PKP" on the banner. On page 70 of the print article (the second page of the story) is the second reference to Phi Kappa Psi, including "his fraternity", "the frat house", and the "frat party". But then we read this line: "But her concerns go beyond *taking on* her alleged assailants and *their fraternity*". It continues. When referring to the Brown incident, it turns out it was "Phi Kappa Psi--*of all fraternities*". Page 73. Then on page 75 of the print article, "The UVa administration took no action to warn

---

[6] Also in the on-line article there are three photographs of the Phi Kappa Psi fraternity house, two from the outside and one on the inside (of a room), all with identifying captions. The print article has the inside photo, but PKP is not identified, and it does not have the two outside photos.

Case 16-2465, Document 43, 10/14/2016, 1884898, Page39 of 44

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary. Esqs.
August 31, 2016
Page Seven (of 12)

the campus that *an allegation* of gang rape had been made *against an active fraternity*". This is followed on that same page by "You can trace UVA's cycle of sexual violence and institutional indifference back at least 30 years—and incredibly the trail leads back *to Phi Psi*". It refers to "gang raped" in the context of Phi Psi and the Phi Psi house twice (on page 75). This is followed by "two other women...assaulted at *his* frat house". On page 76, again we see "UVA strategy of doing nothing to warn the campus of gang rape allegations *against a fraternity*", and Jackie learned of "two other young women who were *Phi Kappa Psi gang rape victims*." It then follows on that page in the 3[rd] column an account of one of the young women "gang-raped as a freshman at the *Phi Psi house*", and the other "assaulted by four men in a *Phi Psi* bathroom", and Jackie's helplessness "when she thought about "*Phi Psi*". And finally, at the end of that page, continuing over to the next page, speaking of gang rape allegations "*against* [not "at"] one of UVA's oldest and most powerful fraternities". (All *italics* added.) There are, thus, at least six references in two pages to "gang rape" linked to Phi Kappa Psi, and not all describing one event.

One cannot read these latter portions and not see that it is a reasonable interpretation that the article is singling out PKP at UVA, not some other fraternity or fraternities in general. There is no other fraternity named or alluded to that could be the object of these references. It is naïve to argue that all taken together this did not put the spotlight on PKP to the exclusion of other frats.

The case of Darling v. Piniella, Civ. A. 91-5219, 1991 U.S. Dist. Lexus 13546, 1991 WL 193524 (E.D.Pa.), is instructive on this point. After a Major League baseball game, the losing team's manager, Lou Piniella[7], made some critical remarks about one of the umpires in the game. The Major League Umpires' Association filed suit, alleging that the statements about this particular umpire defamed all umpires (at least those in the MLUA, which presumably the criticized umpire was). Aside from the issue of whether the statements made were factual or opinion—and the Court assumed the statements were defamatory—the dispositive issue was whether they were "of and concerning" the Plaintiff Umpires' Association.

In ruling that the statements were not "of and concerning" the MLUA, it was important to the Court that "[n]one of the statements on which plaintiff MLUA's claim is predicated identify, refer to, describe or concern the MLUA." At page 4 of opinion. This certainly is in contrast to the case before us, where references to PKP are ubiquitous. While the main part of the opinion talks about the remarks being about one specific person, the Court again mentions that "Here, the statements are clearly not 'of and concerning' plaintiff MLUA. MLUA was neither named nor referred to, and the statements neither apply to...plaintiff MLUA". At page 6 of opinion. The same cannot be said of the *Rolling Stone* article and the UVA fraternity Phi Kappa Psi. "The MLUA...alleged no set of facts that would entitle it to relief." At page 6. "[F]or an

---

[7] Whom I remember as a player when I was in Little League and then in high school!

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary. Esqs.
August 31, 2016
Page Eight (of 12)

organization to have a cause of action for defamation, the remarks must be directed toward the
organization." At page 7, citing Church of Scientology of Cal. v. Flynn, 578 F. Supp. 266, 268
(D. Mass. 1984) (where the statement "was directed at the action of one or a few members, not at
the organization"). The organization must be "the object of the alleged defamations", or "the
remarks must somehow identify the organization or implicate the organization as actively
encouraging the behavior of their members". At page 8. In our case, the fraternity itself is
repeatedly identified and mentioned, and there are facts from which it can be reasonably inferred
that the fraternity approved, condoned, supported, and even encouraged or facilitated such
actions of the various unnamed or unknown (or nonexistent) individuals. So this meets the
Darling test. The *Rolling Stone* article is certainly amenable to the conclusion that it was not just
one or a few individuals viewed as "the problem", but rather the UVA fraternity as a whole was
painted in a bad light.

So this article is not just about rape, or just about sexual assault at colleges in general, or
at UVA, or even a greater likelihood of rape at fraternity events, at least not as a matter of law.
Whether the article was focused on PKP may be a matter for the factfinder--the jury or judge--to
decide. But the Court finds that the article is certainly capable or susceptible of the interpretation
that if it is defamatory, it is defamatory as to Phi Kappa Psi and that in the article there is a clear
basis from which to argue the primary focus of the article was PKP at UVA.

As pleaded, taken as a whole, the article is primarily and significantly about this
particular fraternity, and was certainly "of and concerning" the Plaintiff, and the article's intent
and focus was not just the individual assailants, or fraternities in general, or all fraternities at
UVA, or the University itself, but rather this fraternity in particular. The combination of the
numerous repeated, direct, explicit references to Phi Kappa Psi, combined with several implied
references to "a major frat", "a top tier frat", the "frat that was suspended", in conjunction with
the various individuals referenced as affiliated with the fraternity, if borne out by the evidence,
clearly establishes that it is the fraternity itself that is the main target of the article.

It is not, in the Court's view, just as likely that the article, as pleaded, raises the
likelihood or even possibility that rogue members or aspiring members were responsible for the
described rape, or were the main actors, as suggested by Defendants. The article taken as a
whole, again as pleaded, clearly paints the rape as a fraternity event and happening. That is a
clear possible interpretation, in the Court's view, of the references to previous PKP events and
accusations, and the discussion about UVA's responsibility to confront or sanction this particular
fraternity for the risk it presented to the rest of the University and it students.

So if such article or statements therein are false and defamatory, it is the fraternity, at
least primarily, that is being defamed and damaged. The excerpts cited and quoted in the
Complaint allow argument that the intent was to paint PKP in a bad light and cause people to

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary. Esqs.
August 31, 2016
Page Nine (of 12)

think badly of it, as an entity, as an organization. So I disagree with Defendants on this point, and would overrule the demurrer based on that argument.

Again, the main point is not whether I find such, but whether, in light of the demurrer, the plaintiff has pleaded enough to allow the factfinder to draw such conclusions. In the Court's view, Plaintiff has definitely pleaded enough facts which, if proved and believed, would justify a jury in finding that it is the fraternity itself that would be damaged by any defamatory and recklessly false statements. So the Complaint withstands the Demurrer on this point.

<u>Defamatory Content</u>

The next question is whether, even if the article was solely or primarily about PKP, was it or the tenor of the account and statements contained therein defamatory. That is, does it hold the fraternity up to scorn and ridicule, or paint them in a bad light. With regard to the demurrer, the question is whether the article is capable or susceptible of defamatory meaning. This is a legal issue, to be resolved by the Court.

The case of <u>Webb v. Virginian-Pilot Media Companies, LLC</u>, 287 Va. 84, 752 S.E. 2d 808 (2014), was cited by both parties. The Virginian-Pilot newspaper published an article about Phillip Webb and his two sons. Mr. Webb was a high school assistant principal at an area high school, and previously was a successful track coach at a neighboring high school. The article, without making any false statements, discussed disparate outcomes for two boys (one of them one of Mr. Webb's sons), after an altercation resulting in criminal charges. (Both boys were charged with felonies, and both convicted of misdemeanors.) Webb's son was allowed to stay at his high school and continue to compete in track, eventually going on to college, while the other boy was required to transfer to stay in school, and eventually dropped out of school. A spokesman for the school system was quoted as saying that the Webb boy did not get any preferential treatment simply because of his father's position. The father sued alleging the article falsely implied that his son did get special treatment, despite what the article said.

The Court discussed whether the requirement of defamatory meaning could be by implication, inference, insinuation, or innuendo. The Court stated that it could, but that such inferred meaning must come from the words themselves, and be a reasonable interpretation thereof. 287 Va. at 89. The question there was "whether the words and statements complained of...are reasonably capable of the meaning ascribed to them..." Id., quoting <u>Carwile v. Richmond Newspapers, Inc.</u>, 196 Va. 1, 8-9, 82 S.E. 2d 588, 592 (1954).

This is a question of law to be decided by the Court on demurrer as a part of its essential "gatekeeping function", prior to submission to the jury. Id. at 90-91, citing <u>Perk v. Vector</u>

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary. Esqs.
August 31, 2016
Page Ten (of 12)

Resources Group, 253 Va. 310, 316-17, 485 S.E. 2d 140, 144 (1997). The Court ruled in Webb that, as a matter of law, the article was not reasonably capable of defamatory meaning.[8] Id. at 91.

Pendleton v. Newsome, 290 Va. 162 (2015), cited by Plaintiff, is also enlightening on this issue. In this tragic case a seven-year old child died from severe allergic reaction to a peanut given to her by another student. On several occasions the defendant Superintendent of Schools made public statements about the importance of parents alerting the school to such severe allergies, having a health/safety plan of action, and supplying the school with proper medications and resources. The clear implication—though never stated explicitly—was that the child's mother failed to do such, and was therefore responsible for her child's death.

. In fact, the mother, who was a Licensed Practical Nurse, had actually informed the school of her child's severe allergy, had filled out a "Standard Health/Emergency Plan", and had brought to school an EpiPen to counter anaphylactic reactions. (She was told the EpiPen was not needed and that the school had all the necessary resources and medications, and the mother could take the Pen home to use there.) Therefore, the clear implications and insinuations of the parent's failures or negligence, on all three points, were false.

The Court reviewed the trial judge's sustaining of Defendant's demurrer. The Court first noted that a statement clearly implying the mother was responsible for her child's death is capable of defamatory meaning. This is a legal question for the Court. Whether the statement implied the mother was responsible and whether she was defamed thereby was for the factfinder. In that case, in the words of the Webb opinion, above, the defamatory meaning came from the words themselves. (In Webb, unlike Pendleton and our case, the words did not imply Mr. Webb had done anything wrong.)

In reversing the trial court's sustaining of the demurrer, the Court ruled that it cannot be said that the words are not capable of defamatory meaning. Citing Carwile, above, they said the words are reasonably capable of defamatory meaning when aided by innuendo reasonably inferred from the words themselves.

The facts of the current case are much more akin to Pendleton than to Webb. When the term "gang rape" and PKP are uttered in the same breath, it seems inescapable. The repeated references to "gang rape", in conjunction with the fraternity, along with the specific behaviors, acts, and statements described or repeated, are clearly capable of and susceptible to defamatory meaning. And these are direct statements, not just indirect or innuendo. So this also is not a reason to sustain the Demurrer.

[8] Unlike the present case, Webb involved statements that were literally true, and rested entirely on innuendo.

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary, Esqs.
August 31, 2016
Page Eleven (of 12)

<u>Factual Assertions or Opinion?</u>

  The final question is, if the article is of and concerning Phi Kappa Psi, and if the
statements are potentially defamatory, are they factual statements, assertions, or accusations, or
are they merely statements of opinion? That is, are they amenable or susceptible to being
proved true or false, or just interpretations that can be neither true nor false? This too is a legal
issue for the Court.

  <u>Fuste v. Riverside Healthcare Ass'n.</u>, 265 Va. 127, 575 S.E. 2d 858 (2003), addresses the
requirement that the defamatory statement be factual and not a matter of opinion. In that case
statements were made about two physicians who left their practice after a dispute. Among other
things, the statements asserted the physicians left suddenly, were unprofessional, abandoned their
patients, and that there were questions about their competence, that they were not taking patients,
and left the area. In the context of a demurrer, the Court ruled that such statements must be a
"provably false factual connotation". Pure expressions of opinions (such as, for example, "he
did not make his patients a high enough priority"), dependent on the speaker's viewpoint, are not
actionable. The court there ruled that some of the statements were factual, and some opinion.

  In this case, there were numerous statements that are factual assertions, and demonstrably
true or false. Whether there was or was not a gang rape is subject to proof; it could be proved
that there was or was not a broken glass table and that Jackie got shards of glass in her back; it
could be proved whether Drew existed, and worked at the UVA pool, and whether there was a
PKP event, or whether anyone sexually assaulted Jackie in any way resembling the depiction in
the article. It could be proved true or false whether one of the purported individuals said "We all
had to do it." These are all factual assertions, susceptible of proof. In fact even the inferences—
that such sexual assaults were commonplace and accepted behavior at Phi Kappa Psi, or that the
fraternity condoned, encouraged, or required such gang rape activities—are subject to being
proved to be true or not.

  For that matter it could be proved whether Dean Eramo said what was attributed to her—
"no one wants their daughters to go to the rape school"—or whether Jackie's friends discouraged
her from reporting the "rape".[9]

  Whether either side will be able to prove whether such statements are true or false at trial
is a different matter, but the point is that such statements are factual assertions and are capable of
being proved true or false—they either happened or they did not. Thus, they are factual
statements and not a matter of opinion. They are susceptible to proof by evidence. If they were

---

[9] These quotes also go to the issue of whether the entire article or a substantial portion of it was fabricated by
Erdely and *Rolling Stone,* or whether it was fabricated by Jackie and embellished by Erdely and *Rolling Stone, and*
negligently and recklessly published in failing to check out sources and confirm reports before publishing.

SEP-01-2016 THU 02:36 PM 2466 Document 43, 10/14/2016, 1884890, Page44 of 44    P. 12

Thomas Albro and Rodney Smolla, Esqs.
David Paxton, Elizabeth McNamara, Alison Schary. Esqs.
August 31, 2016
Page Twelve (of 12)

asserted and they were not true, and if they are defamatory, and if they had to do with Phi Kappa Psi, then Plaintiff may recover. Thus, the Demurrer will not be sustained on this ground.

## Conclusion

As Plaintiff responded at oral argument, many if not most of Defendants' arguments are properly directed to the factfinder. The jury or judge hearing the case will have to decide 1) if the statements were made, 2) if they were false, 3) if it was the defendants that made them, 4) if the article held the plaintiff in a poor light, and 5) if any damages were occasioned by or flow or resulted therefrom. So much of Defendants' arguments are more appropriately made to the judge or jury hearing the case. If there is a need to take evidence, or to consider the strength of evidence or likelihood of proof, or interpretation of evidence, such is not a proper consideration upon a demurrer. It is not a matter of the evidence, and what the article actually said, but what the Complaint says it says. I cannot try the case in order to rule on the demurrer.

The Court is only ruling that the Complaint contains enough allegations such that Plaintiff may prevail if proved to be true, and the jury could so find. I note that the totality of the Complaint itself is sufficient without the full content of the article, and that Plaintiff has pleaded sufficient facts without the article, but since the entire article was made a part of the pleading the Court may consider such in overruling the Demurrer. Based on the pleadings, I do not find as a matter of law that 1) the article is not of and concerning Phi Kappa Psi, 2) nor that it is not capable of defamatory meaning, 3) nor that it is a matter of opinion and interpretation as opposed to a matter of factual assertion. Rather, I find that the article, as pleaded, is capable of being reasonably viewed as "of and concerning" Plaintiff[10], that it is capable of being considered defamatory in content[11], and that it is factual and susceptible of being proved true or false[12]. Therefore I overrule the Demurrer on all three grounds.

I ask Mr. Albro and Mr. Smolla to prepare the order reflecting my ruling in this letter. Unless agreed otherwise by the parties, Defendants should file their Answer(s) within 21 days of the date the Court enters such order.

Very Truly Yours,

*Richard E. Moore*

Richard E. Moore

---

[10] See Darling, above, at page 5: "capable of being reasonably understood as intended to refer to [the plaintiff]".
[11] See Carwile, above, 196 Va. at 13: "reasonably capable of the meaning ascribed to them by innuendo", Webb, above, 287 Va. at 91: "not reasonably capable of the defamatory meaning", and Pendleton, above, 290 Va. at 173: "capable of conveying the defamatory innuendo".
[12] See Fuste, above, 265 Va. at 133: "capable of being proved true or false".